## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WILFREDO CUEVAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 06 C 5783 |
| | ) |
| MICHAEL J. ASTRUE, | ) Magistrate Judge |
| Commissioner of Social | ) Arlander Keys |
| Security, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM OPINION AND ORDER

Wilfredo Cuevas, now 52 years old, suffers from chronic pain as a result of a back injury sustained when he fell. He also suffers from visual impairments, urinary incontinence, headaches, depression, an ankle injury, spinal impairments, asthma, and obesity. Mr. Cuevas alleges that as a result of these impairments and the resulting chronic pain, he was and is unable to work as of his alleged onset date of November 27, 1999. On April 4, 2000, Mr. Cuevas filed an application with the Social Security Administration ("SSA") for Disability Insurance Benefits, but the SSA denied his application. After unsuccessfully pursuing an appeal through the SSA's processes, Mr. Cuevas appealed to this Court seeking review of the SSA's denial of his application. This Court granted summary judgment in Mr. Cuevas' favor and remanded the case. Specifically, the case was remanded so that the Administrative Law Judge (ALJ)

could (1) adequately explain her assessment of Mr. Cuevas'
credibility with regard to his physical ailments; (2) consider
the evidence concerning the impact that pain from Mr. Cuevas'
ailments had on his life and his ability to work; and (3)
consider all of Mr. Cuevas' impairments, separately and together,
including what effect his obesity may have had on his ability to
work.

## Facts and Procedural History

Mr. Cuevas filed for Disability Insurance Benefits on April
4, 2000. The SSA denied his claim initially on December 14,
2000, and again upon reconsideration on March 23, 2001. Mr.
Cuevas requested a hearing before an Administrative Law Judge
"(ALJ"), and his cased was assigned to ALJ Maren Dougherty, who
held the requested hearing on November 21, 2001.

This Court summarized the testimony and evidence taken at
the November 21, 2001 hearing before ALJ Dougherty, as well as
the ALJ's consideration of that testimony and evidence in a
previous Opinion, (Cuevas v. Barnhart, No. 02 C 4336, 2004 WL
1588277 (N.D. Ill. July 14, 2004)), familiarity with which will
be assumed. In short, on January 24, 2002, ALJ Dougherty issued
an opinion finding that Mr. Cuevas was not disabled and denying
his claim for benefits. The ALJ's decision became the final SSA
decision when the Appeals council denied review on April 18,

2

2002. Mr. Cuevas then filed a lawsuit, seeking review of the SSA's decision and an award of benefits. This Court granted Mr. Cuevas request for a remand of his case to the Commissioner for further proceedings.

On remand, the case was assigned to Administrative Law Judge Helen Cropper, who held a hearing on March 8, 2006. The ALJ heard testimony from Mr. Cuevas, as well as from Grace Gianforte, a vocational expert ("VE").

### Mr. Cuevas' Testimony

It should be noted at the outset that Mr. Cuevas provided little information at the hearing; he often answered the ALJ's questions by stating that he could not remember. When the ALJ expressed confusion about why Mr. Cuevas was not able to provide as much information as he had in the past, he stated that he believed that his pain and associated depression and anxiety attacks contributed to his memory problems. Record at 959-960.

Regarding his background, Mr. Cuevas testified that he had completed school up to the 9th grade and that he had a GED. Record at 944. He testified that, at one point, he had some sort of certificate in security. Record at 945. He testified that he can read and write in English, as well as speak Spanish, but that he had trouble reading because of poor vision. Record at 945-956. Mr. Cuevas testified that he had to surrender his drivers license

to the Secretary of State but that he didn't know why. Record
957. He testified that he owns a vehicle but that he doesn't
drive, and that he couldn't remember the last time he had driven,
but that it wasn't last year. Record at 948. Mr. Cuevas
initially testified that he used a different social security
number but that he didn't remember when he last used the number.
Record at 931. Later he stated that he didn't remember using a
different social security number at all. Record at 956.

Mr. Cuevas testified that he had been in jail because of a
gun charge of some sort and that he had had other problems with
the law in the past, though he was unable to remember specifics.
Record at 980. He testified that he never took any street drugs
and did not drink alcohol. Record at 981.

Mr. Cuevas testified that he knew he had gotten some money
from certain workman's compensation claims, but that he didn't
remember when he got it or how much he got; nor could he remember
the substance of his claims. He testified that, whatever he had
received, he had spent, and that currently his family helps
support him financially. Record at 941-943. Mr. Cuevas testified
that he did not own any real estate. Record at 983. He testified
that he used to own the building he lives in but that he sold it
to his sister. Record at 983. Additionally, he testified that
he didn't know if his ex-wife owned any property. Record at 983.

4

Mr. Cuevas next testified about some of his past jobs. He testified that he had worked as an exterminator at some point, though he didn't remember any details about the job. Record at 948-949. With some prompting, he was able to recall that he had been a full-time service manager for an extermination company. Record at 953-954. Mr. Cuevas also testified that he had worked as a security guard, though he testified that he could not remember any details about that job. Record at 957. He testified that he thought he stopped being a security guard because he lost his license, though he didn't remember why he lost his license. Record at 959.

He testified that he also worked at Draper and Kramer, where his duties were "to clean, change bulbs, mop" as well as other miscellaneous cleaning duties inside and outside, such as washing windows or shoveling snow. Record at 951. Mr. Cuevas testified that there were some physically demanding aspects to the work, but that he had no problem doing the job until he fell off a ladder and sustained an ankle injury. Record at 952. He testified that he remembered being off work after his ankle injury, but that he didn't remember exactly how long he had resumed working before he fell down the stairs. Record at 952. Mr. Cuevas stated that he didn't remember if he wore his brace after he returned to work. Record at 952. Mr. Cuevas testified

5

that, although he had a lot of other jobs, he didn't remember what they were. Record at 960. He also didn't know if any of the jobs were on his other social security number, but he did testify that he was never paid in cash. Record at 960-961.

Regarding his back injury, Mr. Cuevas testified that he had not worked since he sustained the back injury falling down stairs at Draper and Kramer. Record at 950. He stated that his doctor said he couldn't work after he fell down the stairs. Record at 953. Mr. Cuevas testified that he didn't think he could work now, because he was in pain, confused, had a hard time walking, and had vision problems. Record at 961.

Elaborating on his ailments, Mr. Cuevas explained that he declined back surgery because there was no guarantee it would be successful. Record at 962. Mr. Cuevas stated that the treatments would only temporarily alleviate his pain, but that none of them had any permanent effect. Record at 962-963. Mr. Cuevas testified that his back started to gradually hurt him more and more after he fell. Record at 962. Mr. Cuevas testified that the pain in his back is now constant and steady. Record at 968. Mr. Cuevas testified that he could only stand in one place for five to ten minutes comfortably before his back and right leg started hurting. Record at 984. He stated that sleeping is hard because the pain gets worse when he doesn't move. Record at 968. In

6

addition, he stated that bending, standing for too long, and sitting for too long all increase the pain, but that moving around helps alleviate it. Record at 968. Mr. Cuevas testified that it's difficult to walk also but that he could walk 25-40 feet; however, he testified that, while he's walking, his back, leg, neck, and head bother him. Record at 984. He testified that it may not have been as hard to walk at some times but that he has been in constant pain so he isn't sure. Record at 985. He states that he has used a cane consistently since he fell, but that he has occasionally lost his cane and been without it for a few days until he could get it replaced. Record at 985.

Mr. Cuevas testified that he often has headaches in which the pain is steady, and that medication helps a little. Record at 972. He testified that he takes prescription Tylenol every day. Record at 973. Mr. Cuevas testified that he is sometimes confused, though the ALJ distinguished between confusion and forgetting. Record at 973. Mr. Cuevas testified that he has been depressed since his fall, that he was seeing a psychiatrist but that he had to stop because it was too expensive. Record at 974. He further testified that he took medication for depression, at his doctor's direction, but that he didn't think it helped him. Record at 978.

Mr. Cuevas stated that his eyes had been bothering him for

years and that, in the past several months, they had gotten worse. Record at 992. He testified that he had never worn glasses. Record at 996. Mr. Cuevas testified that his vision was foggy and blurry. Record at 946. He also testified that he had swelling in his eyes, and that he had had vision problems on and off for a long time. Record at 971. He stated that he had mentioned it to doctors in the past, but that they had always assumed his symptoms were caused by allergies. Record at 971. Mr. Cuevas testified that he had received prescriptions from his opthamologist, and that those medications had improved his eyes somewhat. Record at 992.

Mr. Cuevas testified that he has had seizures several times, which he thinks are triggered by the pain in his back. Record at 990-991. He stated that the last one was approximately two months before the hearing before ALJ Cropper (March 8, 2006), and that he remembered nothing before or after the seizure. Record at 991. Mr. Cuevas testified that an ambulance came by, but that rather than taking him to the emergency room, they advised him to see his doctor, who gave him medication for seizures. Record at 991. Mr. Cuevas is unsure how long he has been taking seizure medication. Record at 991.

After noticing that the evidence showed long periods where Mr. Cuevas had not filled his prescriptions, the ALJ questioned

8

Mr. Cuevas about the issue, and his attorney said he couldn't be sure if all the records had been turned in. Record at 932. The ALJ noted that there were only rare visits with treating physicians as of mid-2004, and Mr. Cuevas' attorney agreed. Record at 932. Mr. Cuevas didn't remember why there was a gap between seeing doctors from July 2001 to July 2004. Record at 963-964. Mr. Cuevas testified that he didn't see his doctors regularly because he took the medications they prescribed, but when asked why it appeared he had not filled most of his prescriptions, he responded that he didn't remember. Record at 965. Mr. Cuevas was also not aware of any side effects from any medications he was taking. Record at 997. Mr. Cuevas stated that he didn't remember if he had been in the hospital overnight in the last four years or in the emergency room in the last year. Record at 966. He further stated that he attempted to go to a psychiatrist, but he had the wrong referral information, and that he attempted to go to a board of health clinic, but was waitlisted. Record at 976-977.

When questioned by the ALJ about his physical capabilities, Mr. Cuevas testified that the heaviest thing he thought he could carry was a gallon of milk; he said that his son mostly does the heavier chores. Record at 979.

When asked how he spent his time, Mr. Cuevas testified that

9

he got up at different times because his sleeping schedule was erratic. Record at 981. Mr. Cuevas stated that he got two to four hours of sleep a night, because his pain prevented him from sleeping throughout the night. Record at 994-995. As a result, he testified, he naps throughout the day. Record at 995. He testified that he only walked around, laid down, or sat down for activities. Mr. Cuevas stated that he can sit for 10-15 minutes before he feels the need to move around. Record at 982, 995. Sometimes he walks outside and waters the plants a little. Record at 982. He testified that he did not really watch TV, listen to the radio, or read the newspaper. Record at 982.

When asked if he was aware that he was followed by investigators hired to track him in connection with his workman's compensation claim, Mr. Cuevas stated that he was not. When he was informed that he was followed and photographed driving vehicles, moving around without a cane, and stooping and bending, Mr. Cuevas stated that he could not remember doing any of the things the ALJ said he had been photographed doing. Record at 988-990.

## The Vocational Expert's Testimony

After Mr. Cuevas testified, the ALJ heard testimony from Grace Gianforte, a vocational expert ("VE"). The VE began by asking Mr. Cuevas some questions to supplement what she knew from

10

the exhibit file and the testimony he had just given. First Ms. Gianforte established that, as a maintenance engineer Mr. Cuevas did use some tools, and that despite the title being "maintenance" it was more of a janitorial job. Record at 1001-1003.

With regard to Mr. Cuevas' past work experience, the VE testified that the U.S. Department of Labor identifies the occupation of exterminator as semi-skilled, medium in exertion; the occupation of janitor is unskilled, medium in exertion; the occupation of armed security guard is semi-skilled and medium in exertion; that Mr. Cuevas' other security job sounded like that of a merchant patroller, which would be semi-skilled and light in exertion. Record at 1003.

The VE testified that the skills Mr. Cuevas learned in his occupations would also transfer to light jobs as a counter rental clerk, merchant patroller, inspector, customer service clerk, and order clerk. Record at 1004. The VE testified that no additional education would be required to perform these occupations, and that employers would provide in-service or on the job training. Record at 1005.

The ALJ then asked the VE whether hypothetically, a person with the following limitations would be able to perform Mr. Cuevas' past jobs. Record at 1004. In all the hypothetical's

11

the person would have a GED, the past relevant work described
above, and have the residual functional capacity to perform the
full range of work at the light exertional level with the
following exceptions or limitations 1) that he cannot do
repetitive pushing or pulling against resistance with the left
upper extremity or the right lower extremity; 2) that he should
never climb ladders, ropes, or scaffolds or work on moving or
unstable surfaces; 3) that he can only occasionally climb ramps
or stairs, stoop, kneel, crouch or crawl; 4) that he cannot do
lifting or reaching overhead with the left upper extremity; 5)
that he should not be exposed to concentrated respiratory
irritants; and 6) that he should not be exposed to unprotected
heights or unguarded hazardous equipment. Record at 1005-1006.
The VE testified that such a person should be able to perform Mr.
Cuevas' previous job as a merchant controller.  She also
testified that this job would require good vision, which the ALJ
didn't mention as being a problem.  In addition, the VE testified
that such a person could also work as a self service gas station
cashier, order caller, a dealer accounts investigator; she
testified that those jobs existed in significant numbers in the
regional economy; that there were about 1,500 dealer investigator
positions, 3000 order caller positions, and 2500 self service
station attendant positions. Record at 1006-1007.

12

The ALJ then modified the hypothetical to ask about sedentary work for a person who had not yet reached age 50. Record at 1007. The VE testified that such a person could possibly work as an order taker, a security clerk, a lobby attendant, or a checker/sorter were possible jobs; she also testified that there was a general category of unskilled sedentary jobs, and she testified that each of these positions existed in significant numbers (she testified that there 1500 order taker position, 2000 security clerk positions, 1000 checker/sorter positions, and 1500 unskilled sedentary positions). Record at 1007.

When the ALJ asked the VE how often an employee in a sedentary occupation would be allowed to change from sitting to standing and back the VE stated that, although she didn't have any exact numbers, as long as the employee was on task 80% of the time he would still be competitive. Record at 1007-1008.

The VE testified that Mr. Cuevas' use of a cane would not eliminate any of the sedentary jobs she described, but that it would preclude him from doing all of the light jobs for which there were transferable skills. Record at 1007-1008, 1013. The VE testified that a limitation to simple repetitive unskilled work would not affect her opinion for either light or sedentary work.

13

The VE testified that, if pain and depression led to inappropriate behavior, such behavior could possibly preclude competitive work. Record at 1009. Additionally, she testified, if pain or fatigue required a person to lie down for unscheduled breaks, that person could not sustain competitive employment. Record at 1015. The VE testified that the person being over 50 would not affect her testimony regarding light and sedentary jobs. Record at 1009. However, the VE testified that, if the hypothetical claimant was limited to no more then 2-step tasks, then he would effectively not be able to perform any of the jobs above. Record at 1017.

## The ALJ's Decision on Remand

On June 21, 2006, ALJ Cropper issued an opinion finding that Mr. Cuevas was disabled as of his 50th birthday. But she also found that, before his birthday, a significant number of jobs existed in the national and regional economy that Mr. Cuevas could have performed, and that he was, therefore, not disabled prior to reaching age 50. Mr. Cuevas then filed this lawsuit, seeking review of the agency's decision and an award of benefits. The parties consented to proceed before a magistrate judge, and the case was reassigned to this Court on January 3, 2007. Thereafter, both parties moved for summary judgment. Mr. Cuevas asks the Court to reverse the Commissioner's denial of his claim

14

for benefits, or in the alternative, to remand the case to the Commissioner for further proceedings. The Commissioner has filed a cross-motion for summary judgment, asking the court to affirm the ALJ's findings.

## Discussion

Disability Insurance Benefits are available only to claimants who can establish disability under the terms of the Social Security Act. The social security regulations provide a five-step sequential analysis for determining disability for purposes of eligibility for benefits. Under the regulations, the ALJ is required to evaluate, in sequence, (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner in 20 C.F. R. part 404 Subpart P Appendix 1; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing work in the national economy. *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir.2000) (citing *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995)). The claimant bears the burden of proof at steps one through four; at step five, the burden shifts to the Commissioner. *Knight*, 55 F.3d at 313.

A district court reviewing an ALJ's decision under the above

15

analysis must affirm if the decision is supported by substantial evidence and free of legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir.2002). Evidence is substantial if a reasonable person would accept it as adequate to support a conclusion. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir.2004). Where, however, "the Commissioner's decision lacks evidentiary support, or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele*, 290 F.3d at 940. In the Seventh Circuit, an ALJ must "build an accurate and logical bridge from the evidence to [his] conclusions so that [the Court] may afford the claimant meaningful review of the SSA's ultimate findings." *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th cir.2003). It is not enough that the record contains evidence to support the ALJ's decision; if the ALJ does not rationally articulate the grounds for that decision, the Court must remand. *Steele*, 290 F.3d at 941.

Applying the five-step analysis spelled out above, the ALJ first determined that Mr. Cuevas had not engaged in substantial gainful activity since his alleged onset date. Record at 4. At step two, the ALJ found that Mr. Cuevas suffered from a ruptured right Achilles tendon and additional injuries from a work-related fall, as well as obesity and a severe eye impairment. Record at 4. Though the ALJ found these impairments severe, she ruled at

16

step 3 that Mr. Cuevas' impairments did not meet or medically equal the requirements for one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. Record at 5.

At step 4, the ALJ determined Mr. Cuevas "residual functional capacity" (RFC) to determine whether he could return to his past relevant work. Specifically, the ALJ found that Mr. Cuevas had the physical RFC to perform and sustain most sedentary work throughout the relevant time. She found that he could lift, carry, push and/or pull up to 10 pounds occasionally, although he could not do repetitive pushing or pulling against resistance with the left upper or right lower extremity. The ALJ found that Mr. Cuevas prefers to use a cane when walking farther then 50 feet. She further found that Mr. Cuevas should never climb ladders, ropes, or scaffolds, work on moving or unstable surfaces, or be exposed to unprotected heights or unguarded hazardous equipment due to his reported history of seizures, and that Mr. Cuevas could only occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl. The ALJ found that Mr. Cuevas should not do repetitive reaching or lifting overhead with his left upper extremity, due to his history of right shoulder problems, and he should not do work that would expose him to concentrated respiratory irritants, which might exacerbate his reported asthma.

17

The ALJ also considered Mr. Cuevas' mental RFC, and found that he could perform and sustain simple, repetitive unskilled work during the relevant time. She found that his feelings of pain were treated mostly with over the counter medicine, and that his fatigue, drowsiness, and other symptoms would distract him only rarely during the workday. The ALJ's ultimate step 4 conclusion was that Mr. Cuevas lacked the RFC to perform and sustain his past relevant work of exterminator/pest-control, janitor, or armed security guard throughout the relevant time.

At step 5, the ALJ concluded that prior to reaching age 50, Mr. Cuevas was a "younger individual" with the RFC to perform a significant range of sedentary work and, therefore, he was not disabled and not entitled to benefits. The ALJ found, however, that Mr. Cuevas was disabled as of his 50th birthday. In coming to this conclusion, the ALJ relied upon Medical-Vocational Rule 201.14, which, given Mr. Cuevas' situation, directed a finding of disabled upon reaching age 50.

Mr. Cuevas argues that the ALJ's decision must be reversed or remanded for five reasons: 1) the ALJ's step three findings were erroneous, specifically her findings regarding his visual impairments and that he did not meet Listing 1.04 for Spinal Impairments; 2) the ALJ failed to apply the "Special Technique" for mental impairments found in 20 C.F.R. Sec 404.1520a; 3) the

ALJ failed to analyze evidence concerning Mr. Cuevas' alleged headaches, reduced range of motion of the cervical spine, and urinary incontinence; 4) the ALJ did not specify her reasons in her credibility determination; 5 )the reasons provided by the ALJ for applying the age categories do not build a logical bridge between the evidence and her conclusions. The Court will address each argument in turn.

### 1.(a)   The ALJ's Step Three Findings Concerning Mr. Cuevas' Visual Impairments

Mr. Cuevas first argues that SSR 83-20 required the ALJ to call upon a medical expert to determine the onset date of his visual impairment. The Commissioner argues that, because the ALJ did not definitely determine that Mr. Cuevas' condition met or equaled any listing, no onset date needed to be considered. Social Security Ruling 83-20 ("SSR 83-20") describes how the onset date of a disability should be determined. SSR 83-20, at 109 (C.E.1983). SSR 83-20's explicit purpose is "[t]o state the policy and describe the relevant evidence to be considered when establishing the onset date of disability." *Id.* at 109. For disabilities of nontraumatic origin, there are three factors to be considered in determining the onset date: the applicant's allegations, work history, and medical and other evidence. SSR 83-20 describes the date alleged by the applicant as "[t]he starting point" in determining the onset date; that date "should

be used if it is consistent with all the evidence available."
*Id.* at 110-111. Regarding work history, SSR 83-20 states that
"[t]he day the impairment caused the individual to stop work is
frequently of great significance in selecting the proper onset
date." *Id.* at 110. Medical evidence is described as "the primary
element in the onset determination," and the date chosen "can
never be inconsistent with the medical evidence of record," *Id.*
at 110-111. In cases where there is no medical evidence as to the
precise onset date, but where the disabling impairment seems to
have occurred prior to the date of the first recorded medical
examination, the ALJ "should call on the services of a medical
advisor" to help in making the necessary inferences. Id.

   Contrary to Mr. Cuevas' belief, SSR 83-20 does not
necessarily require the ALJ to call upon a medical expert. An
ALJ only must call on the services of a medical advisor when
there is no precise medical evidence. For example, in *Pugh*, the
ALJ did not have to call upon a medical expert because the ALJ
had "a relatively complete medical chronology of Pugh's medical
condition." *Pugh v. Bowen*, 870 F.2d 1271, 1278 (7th Cir. 1989).
Like the ALJ in *Pugh*, ALJ Cropper had a relatively complete
medical chronology of Mr. Cuevas' medical condition.

   The problem here is not the ALJ's failure to call upon a
medical advisor; the problem is that the ALJ declined to make the

20

findings necessary. With regard to his visual impairment, the ALJ stated that:

> [i]t is possible that [Mr. Cuevas'] current visual impairment is of listing level severity. Nevertheless, [Mr. Cuevas] testified that he only recently sought treatment for that impairment, and he did not consistently complain of difficulty with his vision in the past. Because I find [Mr. Cuevas] currently to be disabled by his other physical impairments, whether [Mr. Cuevas'] visual impairment met a listing today would not affect the outcome of the claim.

Record at 496. The Regulations require that if any severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. See 20 C.F.R. § 404.1523 ("We will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."). See also Golembiewski v. Barnhart, 322 F.3d 912, 918 (7th Cir. 2003). If the ALJ were to find Mr. Cuevas not disabled, she would need to articulate why. If she were to find him disabled, but that the onset date was established by the medical evidence before her, she would need to articulate which evidence she was relying on for that conclusion. Mr. Cuevas alleges ("the starting point") that he has had trouble with his eyes for at least 10 years; the ALJ noted this. Record at 517. If there is medical evidence ("the primary evidence for determining onset") which contradicts this, the ALJ should have

21

pointed it out, and she did not. The ALJ should have made a determination regarding his visual impairment; that she said it is "possible" leaves him unable to invoke SSR 83-20.

The ALJ based her ruling in part on her finding that Mr. Cuevas had only recently sought treatment for his vision, and that he did not consistently complain about the issue. But the law does not always penalize claimants who are not as diligent as perhaps they should be. See *DeFrancesco v. Bowen*, 867 F.2d 1040, 1043-1044 (7th Cir. 1989). In *DeFrancesco,* the claimant was overweight and had a type of diabetes that was not controlled by insulin; yet he failed to see a doctor regularly. Nevertheless, because he had expressed to the court that he had trouble paying for medical services, the court determined that he should not be punished for his failure to pursue those services and remanded the case to the SSA. There is evidence in the record that could lead to a similar conclusion here. Mr. Cuevas testified that his family helps support him financially, and it is not clear from the record that he was deliberately and inexcusably refusing the treatment available to him. And, to the extent the ALJ determined that this was the case, she should have said so. Instead, she simply failed to properly consider Mr. Cuevas' visual impairment.

1.(b)    The ALJ's Findings Concerning Listing 1.04

Mr. Cuevas also argues that the ALJ's step three finding is erroneous because she did not adequately explain her conclusions about Listing 1.04. This Court agrees. In the Seventh Circuit, an ALJ must build an "accurate and logical bridge from the evidence to her conclusion" so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review. The ALJ stated "I note that the many specialists who have reviewed the numerous imaging studies have not consistently interpreted those studies to show the type of anatomic abnormality that would satisfy the listing." Record at 496. However, as Mr. Cuevas correctly points out, the ALJ did not list which specialists, nor detail the alleged inconsistencies    odd, given that she devoted 17 pages of her decision to summarizing the medical conclusions. For example, the ALJ states that the record does not establish that Mr. Cuevas has had a 12-month or longer period of ineffective ambulation, but she did not explain what in the record contradicts Mr. Cuevas' contention that he needed a cane. Record at 491.

There are indeed inconsistencies in the record, and the Commissioner's brief pointed out some of these inconsistencies. For example, the Commissioner points to the November 1999 MRI scan that revealed no spinal cord compression, no significant

23

central spinal canal or foraminal narrowing, and only mild

degenerative arthritis. The problem, as Mr. Cuevas again

correctly points out, is that it was the ALJ who should have

analyzed the evidence and noted the inconsistencies. This is

particularly troubling because this case was previously remanded

when a different ALJ

> spent seven pages of her decision outlining Mr. Cuevas'
> various physical ailments, then she dismissed them out
> of hand, stating that "although scans have shown
> problems in various areas of the spine, there is no
> consistency in terms of symptoms and signs." The ALJ
> never fully discussed the perceived inconsistencies;
> nor did she detail or explain what evidence she relied
> on in rejecting the claim, or discuss the evidence
> favoring Mr. Cuevas on the issue.

*Cuevas v. Barnhart*, 2004 WL 1588277, at *12. Mr. Cuevas'

ailments were once again dismissed out of hand without the

required analysis, this time after 17 pages of summary. Without

such analysis, meaningful review is impossible, and accordingly,

remand is appropriate.

### 2. The ALJ's Use of the "Special Technique"

Mr. Cuevas argues that the ALJ failed to use the requisite

"special technique" when evaluating his mental impairments. In

cases where the claimant presents evidence that he or she suffers

from a mental impairment, the ALJ must follow a "special

technique" prescribed by the regulations. 20 C.F.R. §

404.1520a(a); *see also, Lowe v. Barnhart*, No. 04 C 2022, 2004 WL

24

2203424, *7 (N.D. Ill. Sept. 29, 2004). The ALJ is required to document application of the technique in her decision. 20 C.F.R. §404.1520a(e). Indeed, the ALJ's decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph c. 20 C.F.R. § 404.1520a(e)(2). Paragraph c identifies "four broad functional areas in which [the ALJ] will rate the degree of [the claimant's] functional limitation: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." 20 C.F.R. § 404.1520a(c)(3). When [the ALJ rates] the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), [the ALJ] will use the following five-point scale: None, mild, moderate, marked, and extreme." 20 C.F.R. § 404.1520a(c)(4).

Regarding Mr. Cuevas' mental impairments, the ALJ stated that "claimant has not had the type of persistent marked functional impairment required to meet or medically equal part B or Part C of any of the relevant listings." Record at 498. The ALJ further stated that Mr. Cuevas' descriptions of his functional deficits were contradicted by other evidence, and that his daily and social activities and ability to sustain concentration were apparently limited more by his physical rather

25

than mental impairments.

Although the ALJ did use some of the statutory language (e.g., "marked"), she rated all four functional areas in one broad stroke, with no "specific finding as to the degree of limitation in each of the functional areas," as required by the regulations. The ALJ stated that Mr. Cuevas' mental impairments "are discussed in detail below," but what follows is a summary, not an analysis. The ALJ outlined the medical evidence, but never specifically identified which evidence contradicted Mr. Cuevas' descriptions or which evidence demonstrated that his daily and social activities were limited more by his physical impairments. On remand, the ALJ should comply with §404.1520 and document specific findings in each area.

## 3. The ALJ's Consideration of Mr. Cuevas' Headaches, Reduced Range of Motion, and Urinary Incontinence

Mr. Cuevas argues that the ALJ failed to consider all of his impairments. Specifically, Mr. Cuevas argues, the ALJ failed to consider his headaches, reduced range of motion of the cervical spine, and urinary incontinence. As noted above, the Regulations require that if any severe impairment exists, all medically determinable impairments must be considered in the remaining steps of the sequential analysis. 20 C.F.R. §404.1523. "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his

26

conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004).

Headaches can be a disabling impairment. *Id.* The ALJ noted that Mr. Cuevas reported suffering from headaches throughout her ruling (Record at 502, 513, 515, 516), yet she dismissed the possibility that such headaches might have an impact, noting that his pain was "apparently treated primarily with over-the-counter strength medication." Record at 523. This comment is not directed specifically at Mr. Cuevas' headaches, but is instead a catch-all for whatever pain Mr. Cuevas is experiencing. Additionally, the ALJ does not articulate what facts led her to conclude that Mr. Cuevas was primarily treated with over-the-counter strength medication. That is not a given. There is evidence of prescription medication contained in the record, but the ALJ does not address any of it when concluding that over-the-counter strength medication was the primary treatment. It may be that the ALJ was troubled by the fact that Mr. Cuevas let his prescriptions lag. But again, such a failure is not always punishable. *See DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989).

Likewise, urinary incontinence and a reduced range of motion can both be disabling impairments. *See Golembiewski v. Barnhart*, 322 F.3d 912 (7th Cir. 2003). The ALJ noted that Mr. Cuevas

complained of both during her summary of his medical history
(Record at 507), but she did not analyze either impairment, and
she never considered whether these impairments might have
affected his ability to work. Therefore, remand is appropriate.
On remand, the ALJ should consider, analyze, and articulate all
of Mr. Cuevas' impairments.

## 4.   The ALJ's Credibility Findings

Mr. Cuevas argues that, to the extent the ALJ's RFC
conclusions relied upon her credibility determination, that
determination is not supported by the record. "It is generally
understood that a reviewing court does not reconsider credibility
determinations made by the ALJ so long as they find some support
in the record." *Anderson v. Sullivan*, 925 F.2d 220, 222 (7th
Cir. 1991). "An ALJ's credibility determination will not be
disturbed unless it is patently wrong." *Diaz v. Chater*, 55 F.3d
300, 308 (7th Cir. 1995). Here, the ALJ's credibility finding
was sufficiently supported by the record. In finding that Mr.
Cuevas was not credible, the ALJ noted that 1) Mr. Cuevas'
inability to remember things and to provide information seems to
be unfounded and disingenuous; 2) the workman's compensation
surveillance material showed Mr. Cuevas walking without apparent
difficulty, undermining his claims that he was unable to do so;
3) there were gaps in Mr. Cuevas' treatment that he could not

28

explain; and 4) Mr. Cuevas' failure to explain his use of two different names and social security numbers showed a lack of candor.

The ALJ's observation that Mr. Cuevas seemed to have memory problems relating only to his social security claim was not inappropriate. "An ALJ does not commit an impropriety when he relies on his own observations during a hearing concerning the severity of a claimant's claim. Such observations are credibility determinations and are entitled to considerable weight." *Kelley v. Sullivan*, 890 F.2d 961, 964 (7th Cir. 1989). After a review of the transcript and Mr. Cuevas' medical records, this Court cannot fault the ALJ for this conclusion.

The ALJ was also justified in using the workman's compensation surveillance material. The material shows Mr. Cuevas engaged in activities that he claimed he could not perform. When confronted with this evidence, he offered no explanation; he merely testified that he could not remember doing such activities. The gaps in Mr. Cuevas treatment are not mentioned in this context to show that he failed to try and seek help, but rather to demonstrate that he was reporting to doctors a fact that wasn't true. Mr. Cuevas argues that it was unfair for the ALJ to find a lack of candor in his failure to adequately explain using two different social security numbers and names; he argues

29

that such a finding was inappropriate, given that there was no allegation of fraud. The Court does not agree. There was nothing unfair about the ALJ's determination; it was entirely conceivable and reasonable for the ALJ to find Mr. Cuevas to be less than candid, even though he may not have been so far gone that he was alleged to have committed any fraud.

## 5.    The ALJ's Use of the Age Grid

Mr. Cuevas argues that the ALJ mechanically applied the age categories to him, which turned out to be critical to his claim. When he applied for disability benefits, Mr. Cuevas was 44 years old; as mentioned above, he is now 52. The ALJ determined that, upon achieving the age of 50, Mr. Cuevas' age, in combination with his impairments, rendered him disabled; she determined that, prior to his 50th birthday, he was not disabled. The ALJ thus established Mr. Cuevas' onset date as of May 27, 2005, his 50th birthday. In so finding, the ALJ, specifically, with regard to the application of the grid rules, stated as follows:

> I note that claimant's DLI is December 31, 2004, just less than five months before the established onset date here. I have considered carefully whether I nevertheless should find claimant eligible for Title II Benefits, because the Commissioner and courts have acknowledged the importance of avoiding "mechanical application" of the grid rules. I find in this claim that claimant is not entitled to Title II Benefits.
>
> As noted and discussed in detail above, claimant did not seek significant treatment for his allegedly disabling impairments for the extended period between

30

resolution of his main WC claim and the AC remand of
these disability claims. Claimant, also as noted
above, could not explain credibly why he failed to seek
treatment during that time. I note further that
claimant's condition apparently has deteriorated after
2005. Claimant apparently was able to drive a vehicle
and to ambulate relatively normally, at least within
his community and around his home by 2002, despite his
ankle and back problems. Although claimant has been
obese throughout the period in question, he gained a
significant amount of weight in 2005 and 2006. He
testified (and reported to his treating
ophthalmologists) that he began to have significant
difficulty with his eyes during late 2005 or early
2006.

Record at 526. Mr. Cuevas argues that this language reflects a

mechanical application of the grid and that the ALJ's

determination on this issue was, therefore, improper.

When applying age factors to determine disability, the SSA

uses three categories, two of which relate to Mr. Cuevas:

"Younger persons" and "persons closely approaching advanced age."

20 C.F.R. §404.1563 (c-d). Generally, age is not considered for

"younger persons" (under age 50) when determining their ability

to do other work. 20 C.F.R. §404.1563 (c). However, age, in

conjunction with a severe impairment, can be considered when

determining the ability of "persons closely approached advanced

age" (ages 50-54) to do other work.  20 C.F.R. § 404.1563 (d).

These age categories should not be applied mechanically, and thus

in some situations when a claimant is within a few days to a few

months of the next highest age category, that age category may be

31

used. 20 C.F.R. § 404.1563 (b). The fact that a claimant is near the next age category does not, however, automatically mean that the next age category must be used. If the ALJ determines that "the claimant's age is within a few days or a few months of a higher age category" and that "using the higher age category would result in a decision of 'disabled' rather than 'not disabled,' then a borderline situation exists and the ALJ must determine whether it is more appropriate to use the higher age or the claimant's chronological age." *Freundt v. Massanari,* No. 00 C 4456, 2001 WL 1356146, at *18 (N.D. Ill. Nov. 2, 2001)(citing *Russell v. Commr. Soc. Sec.,* 20 F.Supp.2d 1133, 1135 (W.D. Mich. 1998)). "Like any factual issue, a finding regarding the appropriate age category in which to place a claimant must be supported by substantial evidence." *Smith v. Barnhart,* No. 00 C 2643, 2002 WL 126107, at *3 (N.D. Ill. Jan. 31, 2002)(citing *Daniels v. Apfel,* 154 F.3d 1129, 1136 (10th Cir. 1998)).

The ALJ did not explain her decision to use Mr. Cuevas' chronological age. In fact, only by inference can the Court even assume that she considered assessing the claim as a borderline sitation. The ALJ emphasized that Mr. Cuevas did not "seek significant treatment" and did not "credibly explain" his failure to seek treatment. But, as noted above, a claimant's failure to seek treatment does not necessarily preclude them making a claim

for benefits. *See DeFrancesco v. Bowen*, 867 F.2d 1040, 1043-1044 (7th Cir. 1989). The ALJ found that Mr. Cuevas could drive and ambulate effectively by 2002; yet, that says nothing about what was happening by December 31, 2004.

The ALJ determined that Mr. Cuevas had deteriorated after his DLI. But that finding apparently does not refer to Mr. Cuevas' back problems, which is one of his main impairments; there is evidence in the record, such as the MRI's of his back, suggesting that his condition remained fairly consistent throughout the relevant time. Record at 236-239, 555-557. To the extent the ALJ was referring to Mr. Cuevas' obesity and weight gain, if, as the ALJ recognized, Mr. Cuevas was already obese throughout the relevant time, what is the effect of becoming "more" obese?

Finally, the ALJ seems to justify her disability onset date analysis by noting that Mr. Cuevas' eye problems began during early 2005 or 2006 (after his DLI, in other words). Yet, when asked to consider that impairment specifically, she declined, opting instead to punt by finding that she didn't need to determine the onset date, given that his age alone satisfied the disability consideration. It seems as if the ALJ was trying to play this issue both ways: the vision impairment was, in her estimation, not severe enough to warrant much discussion; yet it

33

was compelling enough to preclude him from being considered in a higher age category for purposes of determining disability.

The Commissioner argues that Mr. Cuevas' arguments about mechanical application of the grid do not apply because "the cases that he cites and the rationale behind not using a mechanical cut-off point is to prevent an injustice where the individual was just shy of turning fifty when his date last insured expired." Yet, that is exactly Mr. Cuevas' situation. To support his position, the Commissioner cites *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir. 1989), for the proposition that "49 is not 50". In *Anderson*, the claimant was almost a year shy of his 50th birthday when the ALJ issued his decision; he argued that the ALJ should have placed him into the next highest age category when analyzing his claim, but the court disagreed, noting that, even under that category, the "closely approaching advanced age" category, the claimant would still have been found to be not disabled. *Id.* at 927. That is not the case here. Here, the ALJ's disability determination turned exclusively on Mr. Cuevas' age -- upon turning 50 he was disabled; prior to that, he was not. The age category is critical here; indeed, this would seem to be precisely the type of case in which the whole borderline standards are most meaningful. The ALJ may have recognized this; she clearly recognized that she was supposed to

34

avoid mechanical application of the grid rules. But she failed
to analyze the situation consistent with the standards set out
above, and, to the extent she did try to explain her findings,
she was wrong on the evidence. Accordingly, the Court must
remand the case.

## Conclusion

For the reasons set forth above, the Court finds that this
case must, once again, be remanded to the Commissioner for
further proceedings. Accordingly, the Court grants Mr. Cuevas'
motion for summary judgment [#21], and denies the Commissioner's
motion for summary judgment [#23]. On remand, the Commissioner
should ensure that the ALJ makes detailed findings concerning the
borderline age range situation, articulating exactly what
evidence is being relied upon; any decision on remand should also
detail findings concerning Mr. Cuevas' visual impairment (e.g.,
whether it is a severe impairment and, if so, what was the onset
date) and the Listing 1.04 impairment. Indeed, it should include
consideration of all impairments supported in the record and,
tangentially, to the extent certain impairments are being
rejected as unsupported, that should be explained as well.

Dated: August 27, 2007                  ENTER:

                                         Arlander Keys

                                         ARLANDER KEYS
                                         United States Magistrate Judge